Page 5644

[1] UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
[2]
[3] UNITED STATES OF AMERICA,
[4]         v.         97 CR 00097-01 (LMM)
[5] BARRY TRUPIN,
[6]         Defendant.
[7]
[8]                 August 16, 1999
                    9:39 a.m.
[9]
    Before:
[10]
            HON. LAWRENCE M. McKENNA
[11]
                    District Judge
[12]        - and a jury -
[13]
[14]            APPEARANCES
[15] MARY JO WHITE
        United States Attorney for the
[16]    Southern District of New York
        BY: STEPHEN RITCHIN
[17]    LYNN NEILS
        Assistant United States Attorney
[18]
     THOMAS P. PUCCIO
[19]    Attorney for Defendant
[20]
[21] Also Present: Patrick Scutero
                   Guy Ficco
[22]
[23]
[24]
[25]

Page 5645

[1] (Trial resumed; jury not present)
[2]     THE COURT: Good morning.
[3]     MR. PUCCIO: Good morning, your Honor.
[4]     THE COURT: I guess what we agreed we would do,
[5] at least what we talked about doing Friday as far as the
[6] jury is concerned, is as follows. After I charge the jury,
[7] I will instruct them, either leaving them in the courtroom,
[8] Mina can watch them or putting them in the jury room, that's
[9] a secondary question. We will interview very briefly those
[10] jurors as to whom there is some sort of a problem, and then
[11] make a determination as to who is released.
[12]    MR. RITCHIN: I thought we said we were just to
[13] just interview Mr. Cunningham who has the problem.
[14]    THE COURT: Is that correct?
[15]    MR. PUCCIO: That's where we left off on Friday,
[16] Judge. While reflecting on this over the weekend, I
[17] requested you interview all jurors on this issue of timing
[18] because we are now a month beyond where they were
    supposed
[19] to be, and I think it is not in my client's interest to have
[20] a rush to judgment here in this complicated case.
[21]    THE COURT: I agree with that. But we have
[22] interviewed jurors about their time problems, and nobody
[23] except a couple have indicated any forthcoming problem. To
[24] suggest problems to them —
[25]    MR. PUCCIO: No, I'd just like to feel

Page 5646

[1] comfortable that the jury is willing to be here as long as
[2] they have to be here, and I think in light of — on the
[3] whole record, considering we are so far behind here in terms
[4] of scheduling, I would ask that every one of the jurors be
[5] interviewed on the timing issue.
[6]     MR. RITCHIN: Judge —
[7]     THE COURT: What happens if people have problems?
[8]     MR. PUCCIO: I think then we have to talk about
[9] it. I'm not sure. I'd rather know now than hear later,
[10] after an adverse verdict, that people had to get out of
[11] there for this, that or the other thing. I just think it is
[12] a very bad situation for Mr. Trupin to be in where people
[13] are anxious to get out of here.
[14]    THE COURT: Yes, but I don't understand the
[15] reason for interviewing jurors who have never suggested a
[16] problem.
[17]    MR. PUCCIO: I just think we are so far beyond
[18] where we were going to be that that is something that is
[19] prudent to do. I would make that request.
[20]    MR. RITCHIN: Judge, the jurors have been
[21] interviewed on several occasions about the scheduling and
[22] have been asked on several occasions to raise issues if they
[23] have issues about scheduling. I don't think there is any
[24] need at this point, nor would it be appropriate, to go juror
[25] by juror and ask people, Do you now have a problem. The

Page 5647

[1] last thing we told them was that we expected to conclude the
[2] presentation of the evidence by August 19. Today is August
[3] 16. So we are within that schedule, and I don't see any
[4] reason to do what Mr. Puccio is suggesting.
[5]  **THE COURT:** I agree. I don't see any need to
[6] interview the entire jury. So, to the extent that is an
[7] application by Mr. Puccio, it is denied.
[8]   My question was, just going over this and
[9] thinking a lot about it over the weekend, maybe there is no
[10] need for this. Maybe we should simply, since they are
[11] adults, take them at their word and assume that Mr. Coleman
[12] is available for Monday, Tuesday — today, Tuesday and
[13] Wednesday, and that Ms. Kimmerling is available all week.
[14]  **MR. RITCHIN:** My recollection of Mr. Coleman's
[15] schedule is he didn't have a problem until Friday, that he
[16] was going to be gone Friday to Monday.
[17]  **THE COURT:** Let me see. I thought it was
[18] Thursday through Monday. That could be confirmed with him
[19] very briefly. My original notes go back a ways. They
[20] indicate that his planned vacation began on Thursday. That
[21] could be confirmed.
[22]  **MS. NEILS:** I believe it was Thursday night,
[23] Judge, is my recollection, too.
[24]  **THE COURT:** Maybe Thursday night. We can
[25] certainly confirm that.

Page 5648

[1]  **MR. RITCHIN:** I think where we left off on Friday
[2] was the only person who had an immediate problem or
[3] potential immediate problem —
[4]  **THE COURT:** Was Cunningham.
[5]  **MR. RITCHIN:** — was Mr. Cunningham. I think it
[6] makes sense to talk to him. But to go beyond that, I think
[7] maybe it will invite problems which won't necessarily occur.
[8] I would request we speak with the other people that say
[9] they're going on vacation as well.
[10]  **THE COURT:** One of them we know is going on
[11] vacation, that's Ms. Kimmerling. She doesn't start until
[12] next week end. Her vacation begins, according to her
[13] original inclination, a week from today. That's August 23.
[14]  **MR. PUCCIO:** Judge, I do think in a case this
[15] long it is not unusual for a jury to deliberate one day for
[16] every week of trial, and that would take us beyond there.
[17] So I would ask that anybody who has a vacation planned who
[18] is capping this at a certain period should be talked to.
[19]  **THE COURT:** But I think we have all their — we
[20] told them that we expected to go through August 19, and we
[21] only have the problems that have already — basically this
[22] is something we have already done. You can't go and ask
[23] them, Are you available on Christmas eve.
[24]  **MR. PUCCIO:** No, Judge, we have people — one
[25] person who can only deliberate until Thursday night, and we

Page 5649

[1] have another person —
[2]  **THE COURT:** Right.
[3]  **MR. PUCCIO:** I think that ought to be explored
[4] because I don't think —
[5]  **THE COURT:** I have no problem with confirming
[6] that with that juror.
[7]  **MR. PUCCIO:** Confirming what, that —
[8]  **THE COURT:** That it is, in fact, Thursday night
[9] that he is planning to leave for the Caribbean. He also
[10] said — we can confirm this — that vacation only lasts till
[11] Monday, so that if deliberations were extended through
[12] Thursday, whenever he has to leave, we could resume again
[13] next week on Tuesday with him.
[14]  **MR. PUCCIO:** He's only going to be gone —
[15]  **THE COURT:** That's what he said.
[16]  **MR. PUCCIO:** — two days?
[17]  **MR. RITCHIN:** It was a long weekend, is my
[18] recollection, he was going to be out Friday and Monday, but
[19] coming back.
[20]  **MR. PUCCIO:** I would still like it explored. How
[21] about the lady who is leaving, can't deliberate after
[22] Friday?
[23]  **THE COURT:** Yes.
[24]  **MR. PUCCIO:** Could we explore that as well?
[25]  **THE COURT:** I can confirm that. I have no

Page 5650

[1] problem confirming it.
[2]  **MR. PUCCIO:** Wouldn't it also be important to
[3] confirm that if you have to deliberate past Friday, then
[4] that's what you're basically agreeing to if you're part of
[5] this jury?
[6]  **THE COURT:** I don't want to make any suggestions
[7] to them about how long they should deliberate. What I
[8] always tell jurors is how long you deliberate is the jury's
[9] business, which it is.
[10]  **MR. PUCCIO:** You're not making a suggestion if
[11] you say just that. It's the jury's business.
[12]  **THE COURT:** Right.
[13]  **MR. PUCCIO:** But it's not inconceivable —
[14]  **THE COURT:** I could ask you informationally, what
[15] happens, should it be the case, the jury is deliberating
[16] after this week.
[17]  **MR. PUCCIO:** I would ask that, I would like that
[18] question to be asked.
[19]  **THE COURT:** Everything I ask a juror I'm going to
[20] preface with a statement, the obvious —
[21]  **MR. PUCCIO:** You're not telling them what to do.
[22]  **THE COURT:** — A, that I don't want them to tell
[23] me anything about what they think about the case; B, I don't
[24] want them to tell me anything they think about how long
[25] deliberations might take; and C, that I'm not suggesting

Page 5683

[1] an affirmative act.
[2]  THE COURT: Right.
[3]  MR. PUCCIO: There's one other minor difference,
[4] which, on this record, doesn't mean anything, which is that
[5] 7203 talks about pay when due and 7201 talks about
[6] deficiency. Deficiency is like conceded here so that
[7] becomes a total nonevent in this case. The only difference
[8] is they could find on this record that the government didn't
[9] make out the affirmative act element and, therefore, it
[10] should be a lesser included offense and that's the only
[11] difference and I can't imagine what the government would say
[12] in summation any differently. They would say, well, there
[13] was an affirmative act here. So the government's not
[14] prejudiced, No. 1, and, No. 2, the Court has the authority
[15] to do it.
[16]  MR. RITCHIN: To fill out what Mr. Puccio can't
[17] imagine we would say, I mean, we would address the issue of
[18] which is the appropriate crime, which is not an issue that
[19] we addressed because it wasn't in the case at the time of
[20] summations.
[21]  THE COURT: I better look at this Watson case, I
[22] guess. I'm glad Mr. Coleman's late, at least they won't
[23] blame this on me or either side.
[24]  (Recess)
[25]  MR. PUCCIO: Judge, I have no objection to your

Page 5684

[1] putting in there that the government believes the lesser
[2] included offense is inappropriate in this case.
[3]  THE COURT: No, I'm not going to give it. I read
[4] the Watson case, which is a D.C. Circuit case and I think
[5] it's page 1345 as opposed to 1445 and the dissenter, which
[6] was Judge Mickler, doesn't address the belated — as the
[7] majority calls it, belated charge request. The rule does
[8] require that the parties know what the charge is prior to
[9] openings. That's the general rule.
[10]  MR. RITCHIN: Your Honor, I think you meant
[11] closings. You just said openings.
[12]  THE COURT: I'm sorry. You will notice I do that
[13] routinely. Before closings. And it is something that I
[14] raised some while ago, so there's no surprise element here
[15] and I think it would be inappropriate at this stage of the
[16] game when arguments have been completed and there's no
[17] opportunity for further closings at this point to include
[18] the lesser included charge, although I believe under the
[19] McGill case, and Mr. Puccio has given me some citations in
[20] furtherance for including it, it would be appropriate if
[21] requested, I believe in all probability if I went through
[22] those other cases I would have found that 7203 can be an
[23] included offense in a 7201 charge, but I think the timing of
[24] it, after closings, makes it inappropriate to include.
[25]  One other thing I wanted to say —

Page 5685

[1]  MR. PUCCIO: Judge, I would request each side be
[2] given another ten minutes to address this issue, which would
[3] cure that problem if in fact there is such a problem.
[4]  THE COURT: Again, I don't think to reopen the
[5] closings at that point would be appropriate. This is
[6] something that I think could have been done some while ago,
[7] so I'm going to proceed to charge the jury.
[8]  One other thing. We had the date wrong,
[9] Ms. Brooks has on the 19th, which is Thursday, a 4 o'clock
[10] appointment.
[11]  THE DEPUTY CLERK: Wednesday is the 19th.
[12]  MR. PUCCIO: Thursday is the 19th.
[13]  MR. RITCHIN: The 19th is Thursday.
[14]  THE MARSHAL: I'm pretty sure she said Wednesday.
[15]  THE COURT: I will take judicial notice that the
[16] 18th is Wednesday and the 19th is Thursday. That I know.
[17]  THE DEPUTY CLERK: I didn't get my dates right.
[18] I did write down Wednesday. I'm sorry, Judge. I can't seem
[19] to get my dates right. She did say Wednesday.
[20]  THE MARSHAL: Wednesday the 18th.
[21]  THE COURT: Okay. And then on the 23rd, she has
[22] a hearing date, but the 23rd is a week from today, if we
[23] were to go that long, Mr. Coleman would be unavailable, so
[24] that would be a day we would have to refrain from
[25] deliberations so that we would have the requisite number of

Page 5686

[1] jurors. So the application to include a lesser offense
[2] charge is denied. The defendant has an exception.
[3]  MR. RITCHIN: I'm sorry. Ms. Neils just stepped
[4] out.
[5]  THE COURT: Let's get Ms. Neils then.
[6]  (In open court; jury present)
[7]  THE COURT: Good morning. Just a couple of
[8] prefatory things. First, I have, as you probably noticed
[9] already, a bad habit of dropping my voice. Should I do
[10] that, please feel free to stick your hand up if I start
[11] speaking too quietly and I'll try to stay near the
[12] microphone. Secondly, I just want to personally thank you
[13] for your patience with us in this case which has extended
[14] about four weeks longer than what we told you during jury
[15] selection. I know this has inconvenienced all of you
[16] personally. I'm sure it's had its impact on people's
[17] families and peoples' employers, and you've been very good
[18] about that and I personally thank you and I think everybody
[19] in this courtroom thanks you. Please don't blame the delays
[20] on either side. That would be very unfair. These things
[21] happen in cases and it happened in this case, but don't
[22] blame either the government or the defendant for the delays.
[23]  I also want to thank you on behalf of everybody
[24] involved in this case, the government, the defendant,
[25] counsel on both sides, and myself, for the attention you

Page 5687

[1] have paid throughout the case.
[2]     You will very soon leave the courtroom and begin
[3] discussing this case in the jury room.
[4]     The government has accused the defendant,
[5] Mr. Trupin, of two crimes, attempting to evade the payment
[6] of income taxes and making a false statement to the Internal
[7] Revenue Service.
[8]     Please remember that these are only charges. In
[9] order for you to find Mr. Trupin guilty, you must be
[10] convinced beyond a reasonable doubt that he committed these
[11] crimes as charged. If you are not convinced beyond a
[12] reasonable doubt that he committed the crimes charged, you
[13] must find him not guilty.
[14]     During the course of the trial you received all
[15] the evidence you may properly consider to decide the case.
[16] Your decision in this case must be based solely on the
[17] evidence presented at the trial. Do not be concerned with
[18] whether evidence is direct evidence or circumstantial
[19] evidence. You should consider all the evidence that was
[20] presented to you, except, of course, any evidence that I
[21] ordered stricken.
[22]     The lawyers, in their closing arguments, have
[23] suggested that you draw inferences, on the basis of your
[24] reason, experience, and common sense, from one or more
[25] established facts, to the existence of some other fact.

Page 5688

[1]     An inference is not a suspicion or a guess. It
[2] is a reasoned, logical decision to conclude that a disputed
[3] fact exists on the basis of another fact which you know
[4] exists.
[5]     There are times when different inferences may be
[6] drawn from facts, whether proved by direct or circumstantial
[7] evidence. The government asks you to draw one set of
[8] inferences, while the defense asks you to draw another. It
[9] is for you, and you alone, to decide what inferences you
[10] will draw.
[11]     The process of drawing inferences from facts in
[12] evidence is not a matter of guesswork or speculation. An
[13] inference is a deduction or conclusion which you, the jury,
[14] are permitted to draw — but not required to draw — from
[15] the facts which have been established by either direct or
[16] circumstantial evidence. In drawing inferences, you should
[17] exercise your common sense.
[18]     While you are considering the evidence presented
[19] to you, you are permitted to draw, from the facts which you
[20] find to be proven, such reasonable inferences as would be
[21] justified in light of your experience.
[22]     Here again, let me remind you that, whether based
[23] upon direct or circumstantial evidence, or upon the logical,
[24] reasonable inferences drawn from such evidence, you must be
[25] satisfied of the guilt of the defendant beyond a reasonable

Page 5689

[1] doubt before you may convict.
[2]     Let me emphasize that a lawyer's question is not
[3] evidence. At times, a lawyer may have incorporated into a
[4] question a statement which assumed certain facts to be true
[5] and asked the witness if the statement was true. If the
[6] witness does not testify that the statement is true, and if
[7] there is no evidence in the record proving that the assumed
[8] fact is true, then you may not consider that fact to be true
[9] simply because it was contained in the lawyer's question.
[10]     In short, questions are not evidence; it is the
[11] answer to a question, in light of what the question was,
[12] that is evidence.
[13]     At times during the trial you heard lawyers
[14] object to questions or to answers by witnesses. This simply
[15] means that the lawyers were requesting that I make a
[16] decision on a particular rule of law. Do not draw any
[17] conclusions from such objections or from my rulings on the
[18] objections. These only related to the legal questions that
[19] I had to determine and should not influence your thinking.
[20]     When I sustained an objection to a question, the
[21] witness was not allowed to answer it. Do not attempt to
[22] guess what answer might have been given had I allowed the
[23] question to be answered.
[24]     Similarly, when I told you not to consider a
[25] particular answer or if I granted a motion to strike certain

Page 5690

[1] testimony, put that answer or testimony out of your mind.
[2] You may note consider it in your deliberations.
[3]     As to certain evidence, I told you it might be
[4] considered for only a limited purpose, such as for the state
[5] of mind of a person. You must only consider such evidence
[6] for the purpose for which I told you the evidence was
[7] admitted.
[8]     Sometimes, I think very rarely in this case, I
[9] may have asked questions of witnesses. If I asked
[10] questions, that did not indicate I had any opinion about the
[11] facts of this case. I do not. The determination of the
[12] facts is your job. It is my job to decide what rules of law
[13] apply to the case. I have explained some of these rules to
[14] you during the course of the trial and I will explain others
[15] of them to you before you go into the jury room. That's my
[16] job. It's not the job of the lawyers. So while the lawyers
[17] may have commented during the trial or in closings on some
[18] of these rules, you are to be guided only by what I say
[19] about them.
[20]     You must follow all of the rules as I explain
[21] them to you. You may not follow some and ignore others.
[22] Even if you disagree or don't understand the reasons for
[23] some of the rules, you are bound to follow them.
[24]     If you decide that the government has proved
[25] beyond a reasonable doubt that Mr. Trupin is guilty of the

Page 5691

[1] crimes charged, it will also be my job to decide what the
[2] punishment should be. You should not try to guess what the
[3] punishment might be. It should not enter into your
[4] consideration or discussions at any time.
[5]  The decisions you reach in the jury room, whether
[6] guilty or not guilty, must be unanimous as to each count.
[7] You must all agree. Your deliberations will be secret. You
[8] will never have to explain your verdict to anyone.
[9]  It is your duty as jurors to talk with one
[10] another and to deliberate in the jury room. You should try
[11] to reach an agreement if you can. Each of you must decide
[12] the case for yourself, but only after consideration of all
[13] the evidence with other members of the jury. While this is
[14] going on, do not hesitate to reexamine your own opinions and
[15] change your mind if you are convinced that you are wrong.
[16] But do not give up your honest beliefs solely because the
[17] others think differently or merely to get the case over
[18] with.
[19]  In a very real sense, you are the judges, judges
[20] of the facts. Your only interest is to determine whether
[21] the government has proved Mr. Trupin guilty beyond a
[22] reasonable doubt.
[23]  As I explained to you earlier, Mr. Trupin is on
[24] trial here because the government has charged that he
[25] committed the federal crimes of attempting to evade the

Page 5692

[1] payment of income tax and of making a false statement to the
[2] Internal Revenue Service. I will soon define for you
[3] exactly what that means and what the government must prove.
[4] The only question you must answer is whether the government
[5] has proved beyond a reasonable doubt that Mr. Trupin
[6] committed the crimes charged. Your answer should be based
[7] solely on the evidence or lack of evidence, in accordance
[8] with my instructions.
[9]  I want to take some time to explain proof beyond
[10] a reasonable doubt.
[11]  The law presumes a defendant to be innocent of a
[12] crime. Thus, a defendant, although accused, begins the
[13] trial with a clean slate, with no evidence against him, and
[14] the law permits nothing but legal evidence to be presented
[15] before the jury to be considered in support of any charge
[16] against the accused.
[17]  So the presumption of innocence alone is
[18] sufficient to acquit a defendant, unless the jurors are
[19] satisfied beyond a reasonable doubt of the defendant's guilt
[20] after careful and impartial consideration of all of the
[21] evidence in the case.
[22]  It is not required that the government prove
[23] guilt beyond all possible doubt. The test is one of
[24] reasonable doubt.
[25]  A reasonable doubt is a doubt based upon reason

Page 5693

[1] and common sense, a kind of doubt that would make a
[2] reasonable person hesitate to act. Proof beyond a
[3] reasonable doubt must, therefore, be proof of such a
[4] convincing character that a reasonable person would not
[5] hesitate to rely and act upon it in the most important of
[6] his or her own affairs. The jury will remember that a
[7] defendant is never to be convicted on mere suspicion or
[8] conjecture.
[9]  The burden is always upon the prosecution to
[10] prove guilt beyond a reasonable doubt. This burden never
[11] shifts to a defendant. The law never imposes upon a
[12] defendant in a criminal case the burden or duty of calling
[13] any witnesses or producing any evidence. So if the jury,
[14] after careful and impartial consideration of all the
[15] evidence in the case, has a reasonable doubt that Mr. Trupin
[16] is guilty of the charges against him, it must acquit.
[17]  Unless the government proves beyond a reasonable
[18] doubt that Mr. Trupin has committed each element of an
[19] offense with which he is charged, you must find him not
[20] guilty of that offense. What I have just said applies to
[21] each of the two offenses charged against Mr. Trupin in the
[22] indictment.
[23]  There is, however, one — and only one — thing
[24] that the government must prove, not beyond a reasonable
[25] doubt, but only by a preponderance of the evidence, and that

Page 5694

[1] is what the law calls venue; that is, that some act in
[2] furtherance of each of the crimes charged occurred in the
[3] Southern District of New York. I will come back to this
[4] requirement later. The standard of proof by which the
[5] government must prove venue — by a preponderance of the
[6] evidence — means that the government must prove that it is
[7] more likely than not that some act in furtherance of each of
[8] the crimes charged occurred in the Southern District of New
[9] York. To prove that something is more likely the case than
[10] not is a much less stringent standard of proof than to prove
[11] something beyond a reasonable doubt.
[12]  As I have just said, it is your job to decide if
[13] the government has proved the guilt of Mr. Trupin beyond a
[14] reasonable doubt. An important part of that job will be
[15] making judgments about the testimony of the various
[16] witnesses who testified in this case. You should decide
[17] whether you believe what each person had to say and how
[18] important that testimony was. In making that decision, I
[19] suggest that you may ask yourself a few questions: Did the
[20] person impress you as honest? Did he or she have any
[21] particular reason not to tell the truth? Did he or she have
[22] a personal interest in the outcome of the case? Did the
[23] witness seem to have a good memory? Did the witness have
[24] the opportunity and ability to observe accurately the things
[25] he or she testified about? Did he or she appear to

Page 5695

[1] understand the questions clearly and answer them directly?
[2] Did the witness' testimony differ from the testimony of
[3] other witnesses?
[4]     These are a few of the considerations that will
[5] help you determine the accuracy of what each witness said.
[6]     Some of the testimony before you is in the form
[7] of videotaped depositions which have been received in
[8] evidence. A deposition is simply the examination of a
[9] witness by the lawyers for the parties before trial. As in
[10] the case of a witness who testifies at trial, the witness
[11] testifies under oath. You should consider the testimony of
[12] a witness given in the form of a deposition according to the
[13] same standards for evaluating the testimony of a witness
[14] given at trial.
[15]     You also heard the testimony of a witness — Tara
[16] Michaels — who has entered into an agreement with the
[17] government pursuant to which the government has agreed not
[18] to prosecute her for certain conduct if she cooperates with
[19] the government as set forth in the agreement.
[20]     Ms. Michaels' agreement with the government does
[21] not mean there was any crime, and cannot be considered as
[22] evidence of criminal wrongdoing by anyone, including Ms.
[23] Michaels and Mr. Trupin.
[24]     The government is entitled to call as witnesses
[25] persons with whom it has entered into such an arrangement,

Page 5696

[1] and you may convict a defendant on the basis of such a
[2] witness' testimony, if you find that that testimony proves
[3] that the defendant is guilty beyond a reasonable doubt.
[4]     However, the testimony of such a witness should
[5] be examined by you with greater care than the testimony of
[6] an ordinary witness. You should scrutinize it closely to
[7] determine whether or not it is colored in such a way as to
[8] place guilt upon the defendant in order to further the
[9] witness' own interests, for such a witness, confronted with
[10] the realization that he or she can avoid prosecution by
[11] helping convict another, has a motive to falsify his or her
[12] testimony, even though the witness may also, under the
[13] agreement, have a motive to testify truthfully. It is for
[14] you to evaluate such a witness' motive.
[15]     Such testimony should be scrutinized by you with
[16] great care and you should act upon it with caution. If you
[17] believe it to be true, and determine to accept the
[18] testimony, you may give it such weight, if any, as you
[19] believe it deserves.
[20]     Mr. Trupin did not testify in this case. Under
[21] our Constitution, a defendant has no obligation to testify
[22] or to present any other evidence because it is the
[23] prosecution's burden to prove a defendant guilty beyond a
[24] reasonable doubt. That burden remains with the prosecution
[25] throughout the entire trial and never shifts to the

Page 5697

[1] defendant. The defendant is never required to prove that he
[2] is innocent.
[3]     The right of the defendant not to testify is an
[4] important part of our Constitution. As the Supreme Court of
[5] the United States has said, and I am quoting now from it:
[6]     "It is not everyone who can safely venture on the witness
[7] stand. Though entirely innocent of the charge against him,
[8] excessive timidity, nervousness when facing others and
[9] attempting to explain transactions of a suspicious character
[10] may only increase rather than remove any prejudice against
[11] him. It is not everyone, however honest, who would
[12] therefore willingly be placed on the witness stand."
[13]     You may not attach any significance to the fact
[14] that Mr. Trupin did not testify. No adverse inference
[15] against him may be drawn by you because he did not take the
[16] witness stand. You may not consider this against him in any
[17] way in your deliberations in the jury room.
[18]     In making up your mind in reaching a verdict, you
[19] cannot make any decisions simply because there are more
[20] witnesses on one side than on the other. Do not reach a
[21] conclusion on a particular point just because there were
[22] more witnesses testifying for one side on that point. Your
[23] job is to think about the testimony of each witness you
[24] heard and decide how much, if anything, you believe of what
[25] he or she had to say.

Page 5698

[1]     Let me turn now to the specific charges in this
[2] case as alleged by the government in the indictment. First
[3] I will read the indictment to you, with the reminder of what
[4] I already told you: that the indictment is not evidence of
[5] anything. It is just a procedural device for bringing
[6] before you the question of whether or not the government has
[7] proved the defendant's guilt of the crimes charged beyond a
[8] reasonable doubt.
[9]     The indictment reads as follows: Count 1, and
[10] there is sort of a heading here, under count 1, that says
[11] "Evasion of payment of income taxes," and then under that
[12] there is a heading that says "Background, Trupin is assessed
[13] more than $6 million in back taxes."
[14]     The indictment is written in numbered paragraphs,
[15] and I will read the numbers to you: "1. Between 1980 and
[16] 1986, Barry Trupin, the defendant, resided in New York, New
[17] York. He described himself as being an executive. That's
[18] in quotes. For the year 1980, Trupin filed a personal
[19] income tax return jointly with his first wife. For each of
[20] the years 1982 through 1986, Trupin filed a personal income
[21] tax return jointly with his second wife. For 1981, Trupin
[22] filed singly.
[23]     "2. In or about the middle 1980s, the Internal
[24] Revenue Service," there's an indication that that will
[25] thereafter be referred to simply as IRS, "located in New

Page 5699

York, New York, commenced auditing the personal income tax returns of Barry Trupin, the defendant, for the years 1980 through 1986. Commencing in or about 1991 and continuing through in or about 1992, after considering appeals by Trupin, the IRS determined that Trupin owed additional taxes for each of these years." And there's an indication that that will thereafter be referred to as the tax deficiencies.

"The tax deficiencies as determined by the IRS were as follows," and there are two columns giving a tax year and the tax deficiency. And they read as follows: 1980, $527,550. 1981, $787,117. 1982, $503,139. 1983, $433,704. 1984, $1,265,273. 1985, $2,939,540. 1986, $215,003.

"3. Commencing in or about November 1991 and continuing through in or about December 1992, Barry Trupin, the defendant, filed petitions in United States Tax Court to protest the tax deficiencies for each year except 1981. In or about January 1992, the IRS assessed the sum of $787,117 against Trupin for the year 1981.

"4. On or about October 26, 1993, Barry Trupin, the defendant, submitted to the IRS," and this is in quotes, "an Offer in Compromise and an accompanying," also in quotes, "Collection Information Statement for individuals, in which he listed his purported assets and liabilities. Trupin's purpose in submitting these documents was to attempt to induce the IRS to accept $385,000 to be paid,

Page 5700

over a ten-year period, to settle his entire tax liability, which he acknowledged exceeded $3 million. In the Collection Information Statement, which he certified under oath was true, Trupin falsely claimed, among other things, that his only assets were $500 in cash and a $48,000 line of credit. In fact, as Mr. Trupin then and there well knew, he had control over, and used for his personal benefit, millions of dollars of property in cash. On or about November 4, 1993, the IRS rejected Trupin's Offer in Compromise.

"5. On or about November 29, 1993, Barry Trupin, the defendant, failed to appear in the United States Tax Court for the scheduled trial relating to his petitions. As a result, on December 28, 1993, default judgments were entered against him for the year 1980 and the years 1982 through 1986. The total amount of those default judgments was $5,894,209. Accordingly, as of December 28, 1993, Trupin owed a total of $6,681,326 in federal income taxes for the years 1980 through 1986."

Now, there is another heading: "Trupin's scheme to evade payment of the income tax assessed against him.

"6. Commencing in or about 1992, in anticipation of having to pay taxes assessed, and continuing through the date of this indictment, Barry Trupin, the defendant, executed a scheme designed to evade payment of more than $6

Page 5701

million in personal income taxes that he owed for the years 1980 through 1986. As described below, Trupin used various means to evade payment of those taxes, including, among others: (a) concealing his assets — including real property, collectibles, and cash — in corporate entities and trusts that he controlled; (b) concealing assets in the names of family members; (c) causing corporate entities that he controlled to sell assets and to distribute the proceeds to corporate bank accounts controlled by him and family members; and (d) transferring assets outside of the United States."

Then there is another subheading: "A. Trupin's use of his corporate entities to secretly pay his personal expenses.

"7. Moneyline, Inc.," there's an indication that that would just be called Moneyline thereafter, "was incorporated in the State of Delaware in June 1987. At that time, Trupin was Moneyline's sole director. In that capacity, Trupin sold the shares of Moneyline to a trust purportedly for his daughter's benefit. In or about 1992, after Delaware dissolved Moneyline due to nonpayment of fees, two of Trupin's family members reactivated the corporation. At various times thereafter, and continuing through the date of this indictment, Trupin and/or his family members and accountants were listed as directors and

Page 5702

officers of Moneyline on various corporate documents. Since at least 1993, Trupin, in some instances along with a family member, controlled Moneyline's bank and brokerage accounts.

"8. Beginning in or about at least 1992, Trupin used various Moneyline bank and brokerage accounts to receive the proceeds of the sales of assets that he controlled, and thereby to conceal his receipt of those proceeds. From in or about at least 1992 and continuing through the date of this indictment, in order to further conceal that he had substantial funds and cash available for his personal use that he could have used to pay taxes that he had due and owing, Trupin utilized funds in various Moneyline accounts, rather than his own personal bank account, to pay bills for personal expenses that he had incurred and luxury items that he had bought for his personal use. Among other items, Trupin used Moneyline funds — in some instances funneled through other corporations — to pay for a sailboat, a Range Rover recreational vehicle, cable television bills, health insurance, dental bills and legal bills."

And there is a subheading "B. Trupin's personal use of the proceeds of the sale of Dragon's Head and his concealment of that personal use.

"9. In or about 1979, RRI Realty," there's an indication that thereafter that will be called simply RRI,

Page 5703

[1] "purchased certain real property, improved with a residence,
[2] located in Southampton, New York. RRI was a subsidiary of
[3] Rothschild Reserve International." There's an indication
[4] that thereafter that will be called Rothschild Reserve.
[5]     "Rothschild Reserve was, in turn, held by a trust
[6] established in 1980 purportedly for the benefit of Trupin's
[7] daughter." It has an indication that that will thereafter
[8] be called the 1980 Trust. "At the time of the purchase of
[9] the property, Barry Trupin, the defendant, was the chairman
[10] of Rothschild Reserve. In or about October 1980, Trupin
[11] became the chairman of RRI.
[12]     "10. At or about the time of the property
[13] purchase, Barry Trupin, the defendant, commenced renovating
[14] the residence for the personal use of himself and his
[15] family. These renovations, which were intended to transform
[16] the Southampton house from a Georgian colonial into a style
[17] approximating a Gothic castle, continued until approximately
[18] 1986, but were never completed. The property was commonly
[19] known by the name Dragon's Head.
[20]     "11. In or about May 1992, RRI sold Dragon's
[21] Head for approximately $3.3 million. At the time of the
[22] sale, the ownership of RRI had been transferred from
[23] Rothschild Reserve to other corporate entities, and
[24] ultimately was owned by a 1983 Trust created purportedly for
[25] the benefit of Trupin's daughter. At this time, Trupin's

Page 5704

[1] family members were officers of RRI. Trupin represented RRI
[2] at the closing.
[3]     "12. Much of the purchase price of Dragon's Head
[4] was paid to individuals and entities who were creditors of
[5] Trupin or of entities controlled by Trupin. For example,
[6] the purchaser of Dragon's Head assumed a mortgage in the
[7] amount of $1,322,000 that had been placed on Dragon's Head
[8] by a law firm that was owed money for legal fees that it had
[9] rendered to Trupin and to entities controlled by Trupin.
[10] The net proceeds of the sale of Dragon's Head, after these
[11] sums and other expenses were paid, were approximately
[12] $962,090," and there's an indication that that will
[13] thereafter be referred to as the net proceeds.
[14]     "13. On or about May 20, 1992, Barry Trupin, the
[15] defendant, directed the lawyer for the purchaser of Dragon's
[16] Head to wire the net proceeds of the sale to the escrow
[17] account of an attorney who had previously represented
[18] Trupin, his family, and various entities controlled by
[19] Trupin. Thereafter, Trupin directed that the net proceeds
[20] in escrow be distributed into three separate bank accounts
[21] in the names, respectively, of three corporate entities:
[22] Mill Creek Realty Corp.," there's an indication that that
[23] will thereafter be called Mill Creek, "Penn Realty Holdings
[24] Corp.," there's an indication that that will thereafter be
[25] called Penn Realty, "and Consolidated Holding Corp.," and

Page 5705

[1] there's an indication that that thereafter will be referred
[2] to as Consolidated. "These accounts were opened for the
[3] purpose of receiving and disbursing the proceeds of the sale
[4] of Dragon's Head.
[5]     "14. According to corporate resolutions filed
[6] with the banks at which the accounts were opened, Barry
[7] Trupin, the defendant, was the chairman of Mill Creek and
[8] Penn Realty. According to a corporate resolution filed by
[9] Consolidated in May 1992, Trupin was the president of
[10] Consolidated; according to a subsequent resolution, Trupin's
[11] daughter replaced him as president. Moreover, both Trupin
[12] and his daughter wrote checks on the Penn Realty, Mill Creek
[13] and Consolidated accounts. Trupin received funds from these
[14] accounts in the form of checks to cash. Trupin also
[15] directed that a $325,000 check be drawn on the Mill Creek
[16] account to Classic Books, a corporation that he controlled.
[17] Classic Books thereafter transferred $300,000 to a Moneyline
[18] account at Marine Midland Bank. Of this sum, at Trupin's
[19] direction, $200,000 was transferred to a Moneyline account
[20] at Merrill Lynch. Among other things, the money in the
[21] Merrill Lynch account was used to purchase a Range Rover
[22] recreational vehicle. Trupin also directed that
[23] approximately half of the net proceeds of the sale of
[24] Dragon's Head — $480,000 — be wire transferred to his
[25] second wife in the British Virgin Islands, purportedly in

Page 5706

[1] repayment of a loan that she had made to him."
[2]     There's another subheading, "C. Trupin's
[3] transfer of assets he controlled to locations outside of the
[4] United States." And then there's a subsubheading, "(i)
[5] Trupin's Sale of the 16th Century Henry II Armor.
[6]     "15. In or about 1980, Rothschild Collection,
[7] Ltd.," and there's an indication that that thereafter will
[8] be called Rothschild Collection, "was incorporated. At that
[9] time, Rothschild Reserve, which was held by the 1983 Trust,
[10] was the sole shareholder of Rothschild Collection, and Barry
[11] Trupin, the defendant, was the sole shareholder, chairman,
[12] and director of Rothschild Collection. Between in or about
[13] 1981 and in or about 1987, the ownership of Rothschild
[14] Collection was transferred to other corporate entities
[15] controlled by Trupin, although, at times, Trupin's family
[16] members served as directors and officers.
[17]     "16. In or about 1983, Rothschild Collection
[18] acquired six suits of armor, including one described as
[19] Milanese three-quarter armor made for Henry II," and there's
[20] an indication that that thereafter will be called the Henry
[21] II armor. The purchase price of the Henry II armor was
[22] approximately $2.5 million. Although title to the Henry II
[23] armor was in Rothschild and its successor corporations, on
[24] or about September 14, 1998, Trupin, in his personal
[25] capacity, pledged the armor as collateral to secure a

Page 5707

[1] promissory note that he made to his second wife.
[2] "17. In or about January 1993, the Henry II
[3] armor was sold for approximately $1,550,000 by Barry Trupin,
[4] the defendant, purportedly as agent for the Trupin Family
[5] Trust," which is in quotes. "The proceeds of the sale were
[6] wire transferred to a corporate account, in the name of
[7] Moneyline, at the Royal Bank of Canada in Vancouver, British
[8] Columbia," and there's an indication that thereafter it will
[9] be referred to as the Royal Bank account, "which had been
[10] opened in November 1993 with a deposit of $500. Other than
[11] the initial $500,000 deposit, all of the funds in the Royal
[12] Bank account were proceeds from the sale of the Henry II
[13] armor. According to a corporate resolution filed with the
[14] Royal Bank of Canada, Trupin and his daughter had signatory
[15] authority over the Royal Bank account.
[16] "18. Between in or about January and in or about
[17] May 1993, Barry Trupin, the defendant, caused over $550,000
[18] to be transferred from the Royal Bank account to purchase
[19] two parcels of land, improved with a house, located in
[20] British Columbia, Canada." There is an indication that that
[21] will thereafter be referred to as the Canadian property.
[22] "In addition, Trupin retained an architect to renovate the
[23] Canadian property, and paid for the renovations with funds
[24] from the Royal Bank account. In order to conceal that the
[25] property was for his personal use, Trupin directed his

Page 5708

[1] daughter to purchase the property in her name, supplying her
[2] with the money through a purported loan to her from
[3] Moneyline of $1 million. Trupin also directed that the
[4] architect bills be sent to his daughter.
[5] "19. In addition to using the proceeds of the
[6] sale of the Henry II armor to purchase and renovate the
[7] Canadian property, Barry Trupin, the defendant, also caused
[8] approximately $195,368 of the proceeds from the sale to be
[9] wire transferred to his second wife in the British Virgin
[10] Islands, in purported repayment of a loan that she had made
[11] to Trupin."
[12] Now, this is subsubheading (ii) "Trupin's
[13] transfer of various collectibles to Canada," and there's a
[14] subheading to that "(a) the crated antiques.
[15] "20. In or about the spring of 1993 Barry
[16] Trupin, the defendant, caused certain crated property, not
[17] specifically described, but valued by him at $600,000, to be
[18] transported to the Canadian property. The cost of the
[19] shipping was paid from the Royal Bank account. According to
[20] a subsequent damage claim filed by Trupin against the
[21] carrier of the property, among the contents in the crates
[22] was an antique fireplace mantle valued at $150,000.
[23] Subsubheading "(b) the Alma-Tadema Piano.
[24] "21. In or about October 1986, Barry Trupin's
[25] second wife, on behalf of the Trupin Family Trust," and

Page 5709

[1] that's in quotes, lent to the Museum of Fine Arts in Boston
[2] a concert grand piano and two stools, dating from the period
[3] 1884-1887, designed by Alma Tadema. In or about March 1989,
[4] Trupin's second wife signed another agreement with the
[5] Museum extending the loan of the piano until at least 1993.
[6] According to each loan agreement, the value of the piano was
[7] $1 million. In or about December 1990, Trupin, in his
[8] personal capacity, signed a promissory note with his second
[9] wife, whereby he pledged the piano as collateral for a loan
[10] from her. In a subsequent modified promissory note between
[11] Trupin and his second wife, dated June 5, 1992, Trupin again
[12] pledged the piano as collateral. In or about 1995, Trupin
[13] contacted the Museum of Fine Arts in Boston and requested
[14] that the museum ship the piano to the Canadian property.
[15] After receiving permission from Trupin's second wife, who
[16] was, on record, the lender of the piano, the museum shipped
[17] the piano to Seattle, Washington, where it was then
[18] transported to the Canadian property."
[19] There's another subsubheading "(c) Fleet of
[20] Rolls-Royces.
[21] "22. Through in or about the 1980s and early
[22] 1990s, Barry Trupin, the defendant, maintained a fleet of
[23] antique Rolls-Royces. These were held in the corporate name
[24] of Paragon Leasing. From at least 1986, Trupin was the
[25] chairman of Paragon Leasing. Although these Rolls-Royces

Page 5710

[1] were held in a corporate name, they were used for personal
[2] travel by Trupin, his family members, and chauffeurs who
[3] drove the Trupin family.
[4] "23. In or about May 1993, Barry Trupin, the
[5] defendant, caused three of these Rolls-Royces — a 1934
[6] Phantom II and two 1950s limousines — to be sent to him in
[7] British Columbia. Trupin registered the Phantom II to
[8] himself at the address of the Canadian property, and
[9] maintained it at that address. Thereafter, in or about
[10] April 1995, Trupin sold the Phantom II to a buyer in the
[11] United States for $200,000. To conceal that he was, in
[12] fact, the owner of the car and the recipient of the proceeds
[13] of the sale, Trupin signed the contract of sale as vice
[14] president of Moneyline, and directed that the proceeds be
[15] wire transferred into a Moneyline account. Although the two
[16] 1950s Rolls-Royce limousines had been unregistered since the
[17] late 1980s, Trupin was listed as the importer of record when
[18] the limousines were shipped to Canada. In or about December
[19] 1994, Trupin sold these limousines for over $52,000."
[20] There is a statutory allegation.
[21] "24. From at least in or about 1992, up through
[22] and including the date of filing of this indictment, in the
[23] Southern District of New York and elsewhere, Barry Trupin,
[24] the defendant, unlawfully, willfully, and knowingly did
[25] attempt to evade and defeat the payment of a large part of

Page 5711

[1] the income tax due and owing by him for the years 1980
[2] through 1986, to wit, approximately $6,681,326, by various
[3] means, including, among others, concealing and attempting to
[4] conceal from the IRS the nature and extent of his assets,
[5] making false statements to the IRS, placing funds and
[6] properties in the names of individual and corporate
[7] nominees, and placing funds and property beyond the reach of
[8] service of process."
[9]     And then there's a reference to the statute on
[10] which the government relies, "Title 26, United States Code,
[11] Section 7201."
[12]     Next is the heading "Count 2," and there's a
[13] subheading for that that says "False statements to the IRS.
[14]     "25. On or about October 26, 1993, in the
[15] Southern District of New York, Barry Trupin, the defendant,
[16] in a matter within the jurisdiction of a department and
[17] agency of the United States, to wit, the Internal Revenue
[18] Service, unlawfully, willfully, and knowingly did falsify,
[19] conceal and cover up by trick, scheme, or device a material
[20] fact, and did make and use a false writing and document
[21] knowing the same to contain false, fictitious and fraudulent
[22] statements and entries, to wit, Trupin caused to be
[23] submitted to the Internal Revenue Service a Collection
[24] Information Statement for Individuals in which he falsely
[25] stated, under penalties of perjury, that his only assets

Page 5712

[1] were $500 in cash and a $48,000 line of credit." And under
[2] that there's a reference to the statute the government
[3] relies on in respect to count 2, "Title 18, United States
[4] Code, Section 1001."
[5]     That's the indictment, and I've read that to you
[6] so you know what the charges in the indictment are. Please
[7] remember that the indictment is not evidence.
[8]     The indictment, by the way, uses the terms
[9] "nominee" and "alter ego." Those terms are frequently used
[10] technical terms and are not to be taken as pejorative. I
[11] will not use the terms themselves, but I will discuss the
[12] principles they represent insofar as they are relevant in
[13] this case.
[14]     Count 1 of the indictment charges that Mr. Trupin
[15] violated Section 7201 of Title 26 of the United States Code.
[16] That section provides, in pertinent part, as follows: "Any
[17] person who willfully attempts in any manner to evade or
[18] defeat any tax imposed by this title or the payment
[19] thereof...shall...be guilty of a crime."
[20]     In this case, the government contends that
[21] Mr. Trupin violated Section 7201 by attempting, beginning in
[22] 1992, to evade and defeat the payment of a large part of the
[23] income taxes due and owing by him for the years 1980 through
[24] 1986 by attempting to conceal from the IRS the nature and
[25] extent of his assets. For purposes of this case, it is

Page 5713

[1] immaterial that, in some of those years, joint returns had
[2] been filed. Mr. Trupin was responsible for payment of all
[3] income taxes due in the years in which joint returns were
[4] filed. That his first or second wife was also responsible
[5] for payment of income taxes due in certain of those years is
[6] not relevant.
[7]     For the sake of clarity, let me point out that it
[8] is only his own personal income taxes for the years 1980
[9] through 1986 that Mr. Trupin is accused of attempting to
[10] evade and defeat, not any income taxes that may have been
[11] due and owing by any other persons or entities, including
[12] any of the trusts or corporations you have heard about with
[13] which Mr. Trupin has some connection.
[14]     (Continued on next page)

Page 5714

[1]     (CONTINUED)
[2]     THE COURT: And it is only Mr. Trupin's assets
[3] which he is accused of concealing and attempting to conceal,
[4] not the assets of any other person or entity. I will
[5] explain to you the rules of law under which you must decide
[6] whether any asset is an asset of Mr. Trupin. Also for the
[7] sake of clarity, let me point out that Mr. Trupin is accused
[8] only of attempting to evade or defeat payment of his
[9] personal income taxes. There is no charge in this case that
[10] Mr. Trupin or any other person or entity failed to file a
[11] tax return as required or filed a false tax return.
[12]     One further point of clarification. This case,
[13] including both counts of indictment, has nothing to do with
[14] the collection of any taxes that may be due to the IRS. It
[15] is a criminal case. There is a distinction between civil
[16] liability upon a defendant for the non-payment of taxes, and
[17] criminal responsibility for personal conduct. We are not
[18] concerned here with civil liability, that is, whether or not
[19] the taxes claimed to be due will be paid. Rather, the
[20] question here is only whether the government has proved
[21] beyond a reasonable doubt that the defendant, Mr. Trupin,
[22] committed the crimes charged in the indictment.
[23]     Now, to establish the defendant's guilt of the
[24] offense charged in Count One of the indictment, the attempt
[25] to evade or defeat the payment of taxes, the government is

Page 5715

[1] required to prove, beyond a reasonable doubt, all of the
[2] following three elements:
[3]     First: The existence of a substantial tax
[4] deficiency in Mr. Trupin's tax returns for the years 1980
[5] through 1986;
[6]     Second: An affirmative act by Mr. Trupin
[7] constituting an attempt to evade or defeat the payment of
[8] that deficiency; and
[9]     Third: That Mr. Trupin acted knowingly and
[10] willfully.
[11]     The first element of the offense charged in Count
[12] One which the government must prove beyond a reasonable
[13] doubt is a substantial tax deficiency or, in other words,
[14] that Mr. Trupin owed substantially more federal income taxes
[15] for the years 1980 through 1986 than was declared on his
[16] income tax returns for those years, and that at least a
[17] substantial part of the federal income taxes owed by him for
[18] those years was not paid.
[19]     The government contends that the IRS, having
[20] found deficiencies in Mr. Trupin's tax returns for the years
[21] 1980 through 1986, assessed, in January of 1992, the sum of
[22] $787,417 against Mr. Trupin for the year 1981, and that, in
[23] December of 1993, the IRS obtained Tax Court default
[24] judgments in the sum of $5,894,209 against Mr. Trupin for
[25] the years 1980 and 1982 through 1986.

Page 5716

[1]     If you find that those default judgments were
[2] entered, you must consider those judgments to be final on
[3] the question whether Mr. Trupin owed the additional taxes
[4] that the Tax Court found that he owed for the years 1980 and
[5] 1982 through 1986.
[6]     The government does not have to prove the exact
[7] amount of the taxes Mr. Trupin owes, only that that amount
[8] is substantial, and it does not have to prove that he
[9] attempted to evade or defeat payment of all of the taxes
[10] alleged in the indictment, only a substantial amount
[11] thereof.
[12]     The second element of the offense charged in
[13] Count One of the indictment which the government must prove
[14] beyond a reasonable doubt is that Mr. Trupin attempted, by
[15] an affirmative act, to evade or defeat payment of income
[16] taxes that he owed.
[17]     The law prohibits a person who owes income taxes
[18] from engaging in affirmative action for the purpose of
[19] concealing from the IRS the nature and the extent of his
[20] assets that he could use to pay those income taxes. That is
[21] what the government contends, in the indictment, that
[22] Mr. Trupin did.
[23]     Note at the outset two things about the
[24] prohibition I have just described. In the first place, to
[25] find Mr. Trupin guilty of the offense charged in Count One

Page 5717

[1] of the indictment, you must find that he engaged in the
[2] affirmative action to conceal his assets from the IRS.
[3] Inaction is insufficient. Thus, for example, the failure to
[4] pay taxes owed to the IRS standing alone, no matter what
[5] assets a person has, does not constitute a violation of the
[6] law that Mr. Trupin was accused of violating.
[7]     In the second place, in order to find Mr. Trupin
[8] guilty of the offense charged in Count One of the indictment
[9] you must find that he engaged in affirmative action to
[10] conceal his own assets from the IRS.
[11]     The indictment charges that Mr. Trupin committed
[12] affirmative acts of concealment of several kinds: By
[13] concealing assets which were his in corporations and trusts
[14] that he controlled; by concealing his assets in the names of
[15] family members; by causing corporations that he controlled
[16] to sell assets which were his and to distribute the proceeds
[17] of those sales to corporate bank accounts that he, or family
[18] members, controlled; and by transferring his assets outside
[19] the United States.
[20]     Mr. Trupin disputes the government's allegations.
[21] He contends that the government has not shown that the
[22] assets in question were his assets. It is his position, for
[23] instance, that the house called Dragon's Head, the Tiffany
[24] clock, the Alma-Tadema piano, the Henry II armor, the
[25] fireplace and the three Rolls Royce automobiles, and the

Page 5718

[1] proceeds of the sale of those assets, were, at all times,
[2] owned by corporations which were in turn owned by trusts for
[3] the benefit of his daughter, Tara Michaels.
[4]     The respective contentions of the government and
[5] Mr. Trupin require that I first explain, briefly, the nature
[6] of trusts and corporations.
[7]     A trust is an arrangement recognized by the law
[8] pursuant to which a person, called the grantor or settlor,
[9] conveys property to a person, called the trustee, to hold
[10] that property for the benefit of another person, called the
[11] beneficiary. Trusts are commonly and properly used for
[12] estate planning, that is, the arrangement of the disposition
[13] of one's property after death. The trustee has legal title
[14] to the property conveyed to him, but he holds that property
[15] in trust for the beneficiary, who is what is called the
[16] beneficial owner of the property conveyed to the trustee,
[17] even though the trustee holds legal title to that property.
[18] The property conveyed to the trustee may be of any sort:
[19] Money, shares of stock of corporations, personal property or
[20] real estate. In cases in which a trust holds shares of
[21] stock of a corporation, even if the trust holds all of the
[22] stock of a corporation, the trust and the corporation are
[23] distinct entities.
[24]     The trustee owes a duty of complete loyalty to
[25] the interests of the beneficiary, and must, in dealing with

Page 5719

[1] the property convey to him as trustee, exclude all selfish
[2] interests and all consideration of the interests of third
[3] persons. However, the written trust instrument may permit
[4] the trustee to engage in self-interested transactions. The
[5] law provides remedies to the beneficiary in cases in which
[6] the trustee breaches that duty of loyalty to the beneficiary
[7] by using the property held in trust for the benefit of
[8] anyone other than the beneficiary, whether the for the best
[9] benefit of the trustee himself or of a third-party. Various
[10] details of a trust are normally governed by the written
[11] trust instrument by which it is established, for example,
[12] how long the trust is to last, when a beneficiary is to
[13] receive some or all of the property held in trust, and who
[14] is to succeed as trustee if the original trustee or
[15] successor trustee for any reason does not continue to act as
[16] trustee. There is nothing inappropriate or illegal in a
[17] member of the same family as the settlor or the beneficiary
[18] or both serving as a trustee.
[19]   As I have said, the trustee holds legal title to
[20] the property held by him in trust. As trustee, holding
[21] legal title, he has control over the use of disposition of
[22] that property. The general rule is that the property held
[23] by the trustee in trust is not considered to be his own
[24] property for tax purposes, notwithstanding his control of
[25] the property. There can, however, be circumstances in which

Page 5720

[1] this general rule does not apply, which I will explain.
[2]   Turning now to corporations: A corporation is a
[3] legal entity provided for by the law. In the case of a
[4] corporation, one or more persons, called shareholders or
[5] stockholders, own the shares of stock of the corporation.
[6] The corporation is an entity distinct from the shareholders.
[7] That is so even if the corporation has only one shareholder.
[8] One characteristic, and benefit, of a corporation is what
[9] the law calls limited liability. That means that the
[10] shareholders are not personally responsible for the
[11] liabilities of the corporation. Nor is the corporation
[12] responsible for the personal liabilities of its
[13] shareholders, although a creditor of a shareholder may
[14] obtain the shareholder's shares of stock in the corporation
[15] in satisfaction of a personal debt of the shareholder
[16] because, those shares are the shareholder's property.
[17] Another characteristic, and benefit, of a corporation, is
[18] that partial or complete ownership of a corporation,
[19] represented by its issued shares, can be readily transferred
[20] by transfer of shares. A corporation may properly hold the
[21] shares of another corporation. There is nothing
[22] inappropriate or illegal in members of the same family as
[23] the shareholder of a corporation serving as directors or
[24] officers of the corporations.
[25]   As a general rule, a corporation and its

Page 5721

[1] shareholders, even a sole shareholder who holds all of the
[2] shares in the corporation, are distinct for tax purposes.
[3] If a corporation has income, the corporation, not the
[4] shareholders, is responsible for paying tax on that income.
[5] If the shareholder has income, the shareholder, not the
[6] corporation, is responsible for paying tax on that income,
[7] even if the income consists of a distribution in the form of
[8] a dividend by the corporation to the shareholder. There
[9] can, however, be circumstances in which this general rule
[10] does not apply, which I will explain.
[11]   With that background in mind, let me now turn to
[12] the government's contentions.
[13]   The government contends, in substance, that the
[14] assets of the trusts for the benefit of Mr. Trupin's
[15] daughter and the assets of Mill Creek Realty Corp., Penn
[16] Realty Holding Corp., Consolidated Holding Corp., Moneyline,
[17] Inc., Fanderton Trading, Ltd., RRI Realty Corp. and
[18] Rothschild Reserve International and its subsidiaries,
[19] including Rothschild Collections, Inc., were, or became,
[20] those of Mr. Trupin. I told you a few minutes ago that the
[21] assets of a trust are generally not those of the trustee for
[22] tax purposes, and that the assets of the corporation, even
[23] if it has only one shareholder, are generally not those of
[24] the shareholder for tax purposes, but that there could be
[25] circumstances in which these rules will not apply. What are

Page 5722

[1] those circumstances?
[2]   In brief summary, and subject affirm the rules I
[3] will explain, the circumstances may be stated as follows:
[4] When the trustee or the shareholder, as the case may be,
[5] himself uses the assets of the trust or the corporation as
[6] if they were merely his own personal property, for his own
[7] personal, not trust or corporate, purposes, then, to that
[8] extent, the assets will be considered to be his for tax
[9] purposes. Keep in mind, however, that a trustee, as a
[10] matter of law, is responsible for control of the assets of
[11] the trust, and that a sole shareholder, as a matter of law,
[12] is given complete control over the corporation of which he
[13] is a sole shareholder. The trustee or sole shareholder thus
[14] properly has command over the assets of the trust or
[15] corporation. The exercise by a trustee or a shareholder of
[16] the control given him by law over the assets of a trust or a
[17] corporation is not, standing alone, a proper reason to treat
[18] the assets of the trust or the corporation as those of the
[19] trustee or shareholder. In order for you to find that the
[20] assets of any trust or corporation became the assets of
[21] Mr. Trupin, you must find that, as trustee or shareholder,
[22] he exercised his control over the trust or the corporation,
[23] exercised his command over the property of the trust or
[24] corporation, and used the trust or corporate assets, for his
[25] own personal purposes, not for trust or corporate purposes.

Page 5723

[1] Keep in mind that there are what might be called
[2] personal purposes that coincide with trust or corporate
[3] purposes. Thus, if you find that, as trustee, Mr. Trupin
[4] acted with the purpose of increasing or preserving the
[5] assets of the trusts, or the assets of corporations owned by
[6] one of the trusts, for the ultimate benefit of his daughter
[7] as beneficiary, such action or that reason would not be a
[8] personal use of trust or corporate assets that would justify
[9] treating the trust assets as personal assets of Mr. Trupin.
[10]   There are several other factors which you may
[11] consider in connection with the question of whether
[12] Mr. Trupin so used the assets of a corporation that they are
[13] to be regarded by you as his own assets tax purposes. One
[14] is whether the corporation was formed for or conducted in
[15] some sort of business activity. As to this factor you must
[16] bear in mind that to hold property as an investment is a
[17] legitimate business activity. Nor is there anything
[18] improper in one corporation merely holding the shares of one
[19] or more other corporations, in other words, being a holding
[20] company. That is a proper business activity as well, unless
[21] you find that it was arranged by Mr. Trupin for the purpose
[22] of concealment of his own assets from the IRS. Another fact
[23] you may consider is whether the corporation observed in
[24] substance normal corporate formalities, such as the election
[25] or appointment of directors and officers and the keeping of

Page 5724

[1] records of its activities. You may consider any family
[2] relationship between a shareholder and the directors or
[3] officers of the corporation, but, in this connection, you
[4] must keep in mind that in the case of a corporation all of
[5] the shares of which are owned by a single shareholder, the
[6] corporation may be governed by consent of the sole
[7] shareholder. And, if that sole shareholder is a trust, then
[8] the corporation may be governed by consent of the trust
[9] exercised by the trustee. Another factor you may consider
[10] is whether the corporation filed income tax returns. In
[11] considering these factors, you may consider, among other
[12] things, the charter and bylaws of any corporation.
[13]   I have said that you may consider these factors.
[14] They are not, however, dispositive by themselves. The facts
[15] that a corporation was not formed for a business purpose or
[16] did not conduct any business or did not observe normal
[17] corporate formalities or did not file tax returns, if you
[18] find that those are the facts, do not mean, standing alone,
[19] that Mr. Trupin did use the corporation's assets as his own.
[20] Such facts may support an inference that Mr. Trupin had the
[21] opportunity to use the corporation's assets as his own, but
[22] the government must still prove that Mr. Trupin did use the
[23] corporation's assets as his own, for his own personal, as
[24] opposed to any corporate, purposes.
[25]   In the case of a trust, there are also factors

Page 5725

[1] you may consider in connection with question whether
[2] Mr. Trupin so used the assets of a trust that they are to be
[3] regarded by you as his assets for tax purposes. One is
[4] whether the trust was created and administered for a family
[5] or estate planning purpose. A trust the purpose of which is
[6] so convey wealth to a child after one's death is such a
[7] purpose. Another factor you may consider is whether
[8] Mr. Trupin acted in accordance with the provisions of the
[9] written instruments by which the trusts were created. In
[10] connection with these factors, you should consider, among
[11] other things, the terms of those instruments.
[12]   Again, however, these factors are not
[13] dispositive. Even if you find that the trust was not
[14] created or administered for a family or estate planning
[15] purpose or that Mr. Trupin disregarded the terms of the
[16] trust instrument, the government must still prove that
[17] Mr. Trupin did use the trust's assets for his own personal,
[18] as opposed to any trust, purpose.
[19]   If you do find that the assets of any trust or
[20] corporation were, or became, the personal assets of
[21] Mr. Trupin, that again is not, by itself, sufficient for you
[22] to find Mr. Trupin guilty of the charge contained in Count
[23] One of the indictment. You must also find that his use of
[24] those assets for personal purposes was an attempt on his
[25] part, by an affirmative act, to conceal those assets from

Page 5726

[1] the IRS.
[2]   Putting aside the question I have been talking
[3] about — under what circumstances the assets of a trust or a
[4] corporation are being considered to be Mr. Trupin's own
[5] assets for tax purposes — the government contends that
[6] Mr. Trupin placed assets which were his own in the names of
[7] others, specifically including the property on Vancouver
[8] Island in Canada, sailboat named the Isis and the Land Rover
[9] Defender automobile in the name of his daughter Tara
[10] Michaels, Dragon's Head in the name of RRI Realty Corp., and
[11] money in bank accounts of Mill Creek Realty Corp., Penn
[12] Realty Holding Corp., Consolidated Holding Corp., Moneyline,
[13] Inc., and Fanderton Trading Ltd.
[14]   If a person places his property in the name of
[15] another person or entity for that other person or entity to
[16] hold for him in that other's name, without transferring
[17] ownership to that other, then the property remains the
[18] property of the person who, for the purpose of holding it in
[19] another name, placed it in the name of the other.
[20]   If you find that Mr. Trupin did place an asset of
[21] his own in the name of another person or entity to hold for
[22] him, however, that is not sufficient by itself for you to
[23] find Mr. Trupin guilty of Count One of the indictment. The
[24] government must also prove that his doing so was an attempt,
[25] by an affirmative act, to conceal his assets from the IRS.

Page 5727

[1] The government also contends that Mr. Trupin
[2] moved assets which were his out of the United States, to
[3] Canada. If you find that Mr. Trupin did so, that is not
[4] sufficient, by itself, to find Mr. Trupin guilty of Count
[5] One of the indictment. The government must also prove that
[6] his doing so was an attempt, by an affirmative act, to
[7] conceal his assets from the IRS.
[8] I have said, in connection with all of the
[9] government's contentions, that you must find that Mr. Trupin
[10] attempted, by an affirmative act, to conceal his assets from
[11] the IRS. You must also find that any such attempt occurred
[12] in 1992 or later. Mr. Trupin cannot be found guilty on the
[13] basis of an attempt to conceal his assets from the IRS on
[14] the basis of an act that occurred prior to 1992.
[15] One further point: Although the government must
[16] prove beyond a reasonable doubt that Mr. Trupin attempted,
[17] by an affirmative act, to conceal his assets from the IRS,
[18] it need not prove each allegation; the proof of one such act
[19] is sufficient, provided, however, that all jurors
[20] unanimously agree as to which affirmative act has been
[21] proved beyond a reasonable doubt. It is not sufficient if
[22] some jurors find that one such affirmative act was proved
[23] beyond a reasonable doubt, and others a different act.
[24] The third element that the government must prove
[25] beyond a reasonable doubt is that Mr. Trupin, if you find

Page 5728

[1] that he attempted, by an affirmative act, to conceal assets
[2] from the IRS, did so knowingly and willfully.
[3] An act that is done knowingly only if it is done
[4] purposely and deliberately and not because of mistake,
[5] accident, negligence or other innocent reason. An act is
[6] done willfully if it is done voluntarily and intentionally
[7] with intent to do something the law forbids, that is to say,
[8] with purpose either to disobey or disregard the law. An act
[9] is not done knowingly and willfully if it is done as a
[10] result of some innocent or legitimate reason, or for some
[11] other purpose than to evade and defeat the payment of taxes.
[12] Thus, if you find that Mr. Trupin concealed assets which
[13] were his only to conceal them from creditors other than the
[14] IRS, such as the National Union insurance company, you could
[15] not find that the willfulness required for finding him
[16] guilty of Count One had been proved. However, if you find
[17] that Mr. Trupin had more than one purpose, of which one was
[18] to conceal his assets from the IRS, then you could find that
[19] that requirement had been proved.
[20] A defendant does not act willfully if he believes
[21] in good faith that his actions comply with the law.
[22] Therefore, if Mr. Trupin believed that what he was doing was
[23] in accord with the law, he cannot be said to have had the
[24] criminal intent to willfully evade and defeat the payment of
[25] taxes. Thus, if you find that Mr. Trupin honestly believed

Page 5729

[1] that he was not obliged to, or could not, pay his taxes with
[2] the assets the government contends were his, even if that
[3] belief was unreasonable or irrational, then you should find
[4] him not guilty. However, you may consider whether that
[5] belief was actually reasonable as a factor in deciding
[6] whether he held that belief in good faith. In this
[7] connection, I instruct you that no one is presumed to know
[8] the law relating to criminal violations of the tax laws. It
[9] should also be pointed out that neither a defendant's
[10] disagreement with the law nor a belief that the law is
[11] unconstitutional constitutes a defense of good faith.
[12] A defendant is under no burden to prove his good
[13] faith. The burden of establishing lack of good faith and
[14] the existence of criminal intent rests upon the government.
[15] In determining whether a defendant acted in good
[16] faith or whether he willfully attempted to evade or defeat
[17] the payment of taxes, you may consider all of the evidence
[18] in this case which bears on the defendant's state of mind.
[19] How did you determine whether a person is acting
[20] "knowingly" or "willfully," or what particular intent he has
[21] doing a particular act? One does not put up a sign saying I
[22] am acting "knowingly" or "willfully," or I am acting this or
[23] that specific intent, and it is impossible to read a
[24] person's mind.
[25] You determine whether a person is acting

Page 5730

[1] "knowingly" or "willfully" in a given situation, or what his
[2] particular intent may be in that situation, just as you
[3] would determine any other fact in this case — that is, by
[4] considering every bit of evidence in the case about that
[5] person and that situation, concluding from all of such
[6] evidence whether or not the particular act you are
[7] considering was "knowingly" and "willfully" performed, or
[8] whether or not it was performed with any particular intent.
[9] It is up to you to decide what evidence is relevant to that
[10] particular question. Any evidence in the case at all that
[11] you think is relevant to the question can be used by you in
[12] determining that question.
[13] I will now turn to Count Two of the indictment.
[14] Since we have spent some time in Count One, I will read
[15] Count Two again. That is only a single paragraph.
[16] Again, keep in mind this is the indictment and
[17] the indictment is not evidence. I am reading Count Two
[18] again so you will know what the charge is. Count Two reads,
[19] and this is paragraph 25 of the indictment: On or about
[20] October 26, 1993, in the Southern District of New York,
[21] Barry Trupin, the defendant, in a matter within the
[22] jurisdiction of a department and agency of the United
[23] States, to wit, the Internal Revenue Service, unlawfully,
[24] willfully and knowingly did falsify, conceal, cover up by
[25] trick, scheme and device a material fact, and did make and

Page 5731

[1] use a false writing and document knowing the same to contain
[2] false, fictitious and fraudulent statements, to wit, Trupin
[3] caused to be submitted to the Internal Revenue Service a
[4] Collection Information Statement for Individuals in which he
[5] falsely stated, under penalties of perjury, that his only
[6] assets were $500 in cash and a $48,000 line of credit.
[7] Title 18, United States Code, Section 1001,
[8] provides in relevant part that:
[9] Whoever, in any matter within the jurisdiction of
[10] any department or agency of the United States knowingly and
[11] willfully falsifies, conceals, or covers up by any trick,
[12] scheme, or device a material fact; or . makes or uses
[13] any false writing or document knowing the same to contain
[14] any materially false, fictitious or fraudulent statement or
[15] entry, shall be [guilty of a crime].
[16] In order to meet its burden of proof on Count
[17] Two, the government must prove beyond a reasonable doubt all
[18] of the following four elements:
[19] First, that on or about the date specified in the
[20] indictment, Mr. Trupin used a writing or document;
[21] Second, the writing or document contained a
[22] material false, fictitious or fraudulent statement or entry;
[23] Third, Mr. Trupin knew the writing contained a
[24] false, fictitious or fraudulent statement or entry, and
[25] willfully used said writing or document; and

Page 5732

[1] Fourth, the document or writing was used, in a
[2] matter within the jurisdiction of the government of the
[3] United States.
[4] The first element that the government must prove
[5] beyond a reasonable doubt is that Mr. Trupin used a writing
[6] or document. In this regard, the government need not prove
[7] that he physically made or otherwise personally prepared the
[8] writing or document. It is sufficient to satisfy this
[9] element if you find that he caused the writing or document
[10] charged in the indictment to have been made or used.
[11] The second element that the government must prove
[12] beyond a reasonable doubt is that the writing or document
[13] was false, fictitious or fraudulent. A statement or
[14] representation is "false" or "fictitious" if it was untrue
[15] when made, and known at the time to be untrue by the person
[16] making it or causing it to be made. A writing or document
[17] is "fraudulent" if it was untrue when made and was made or
[18] caused to be made with the intent to deceive the government
[19] agency to which it was submitted.
[20] The indictment alleges that Mr. Trupin, in the
[21] Collection Information Statement dated October 26, 1993,
[22] submitted to the IRS, falsely stated that his only assets
[23] were $500 in cash and a $48,000 line of credit. The
[24] government contends that Mr. Trupin's assets at that time
[25] included, among other things, property at 3700 Trans Canada

Page 5733

[1] Highway on Vancouver Island in British Columbia, Canada;
[2] three Rolls Royce automobiles; the piano designed by Alma
[3] Tedema; a sailboat called the Isis; antiques valued by Barry
[4] Trupin at approximately $600,000, including chimneypieces,
[5] an antique Tiffany grandfather clock and 17 lots of arms and
[6] armor; a white Rover Defender vehicle; and approximately
[7] $700,000 in funds in bank and brokerage accounts in the name
[8] of Moneyline, Inc. As it does with respect to Count One,
[9] the government contends that Mr. Trupin himself was the true
[10] owner of those assets, even if they were held in the name of
[11] his daughter, corporations and/or trusts.
[12] I will not repeat here my earlier instructions as
[13] to when an asset held in the name of Mr. Trupin's daughter
[14] or a trust or corporation is Mr. Trupin's own asset, but you
[15] should bear those instructions in mind when considering this
[16] element of Count Two.
[17] You should also bear in mine that the government
[18] is not obliged to prove that Mr. Trupin was the true owner
[19] of all of the assets that I have just listed. The
[20] government satisfies its burden of proving that Mr. Trupin's
[21] statement about the extent of his assets was false if it
[22] proves beyond a reasonable doubt that he was the true owner
[23] of any material assets beyond those listed on the Collection
[24] Information Statement. You must, however, unanimously agree
[25] on more than one or more assets that were omitted. It is

Page 5734

[1] not sufficient if some jurors find one asset was omitted and
[2] other jurors find a different asset was omitted.
[3] The government must also prove beyond a
[4] reasonable doubt that the false statement or representation
[5] was material. A statement is material if it could have
[6] influenced the government agency's decision or activities.
[7] However, proof of actual reliance on the statement by the
[8] government is not required.
[9] The third element that the government must prove
[10] beyond a reasonable doubt is that the defendant acted
[11] knowingly and willfully. I have already instructed you, in
[12] connection with Count One, what knowingly and willfully
[13] mean. And that applies to Count Two as well. The fourth
[14] and final element that the government must prove beyond a
[15] reasonable doubt is that the writing or document was used
[16] with regard to a matter within the jurisdiction of the
[17] United States Government. I charge you that the IRS is a
[18] department of the United States Government. To be within
[19] the jurisdiction of a department or agency of the United
[20] States Government means that the statement must concern an
[21] authorized function of that department or agency.
[22] You will note that the indictment alleges that
[23] certain acts occurred on or about specific dates. It does
[24] not matter if the evidence you heard at trial indicates that
[25] a particular act occurred on a different date. The law

Page 5735

[1] requires only a substantial similarity between the dates
[2] alleged in the indictment and the dates established by the
[3] evidence.
[4]     I remind you, however, that in connection with
[5] Count One, Mr. Trupin is accused of attempting, by
[6] affirmative act, to conceal his assets from the IRS only
[7] beginning in 1992, not at any earlier time, and that in
[8] connection with Count Two. The Collection Information
[9] Statement submitted to the IRS speaks of Mr. Trupin's assets
[10] as of its date, and must, for you to find him guilty of
[11] Count Two, be found to have been false on that date.
[12]     Also, the indictment alleges certain dollar
[13] amounts. Again, the law only requires a substantially
[14] similarity between the indictment and the proof. Thus, if
[15] you find that the evidence indicates that, in fact, a
[16] different amount was involved, it is for you to determine
[17] whether the difference was material.
[18]     In addition to all of the elements of the two
[19] counts of the indictment which I have just described to you,
[20] you must also decide with respect to each count of the
[21] indictment whether any act in furtherance of the crime
[22] charged in that count occurred within the Southern District
[23] of New York. I instruct you that the Southern District of
[24] New York includes Manhattan and Westchester County,
[25] including the City of White Plains.

Page 5736

[1]     The government need not prove that all of the
[2] conduct charged in the indictment occurred in the Southern
[3] District. Venue turns on whether any act in furtherance of
[4] the crime was committed within the district.
[5]     Moreover, the government need only prove venue by
[6] a preponderance of the evidence. Preponderance of the
[7] evidence simply means to prove that something is more likely
[8] so than not so. You may rely upon direct or circumstantial
[9] evidence in making this final. Please remember that the
[10] preponderance of the evidence standard applies only to the
[11] element of venue and that the government must prove all of
[12] the other elements of the counts of the indictment which I
[13] previously described to you beyond a reasonable doubt.
[14]     You heard testimony that documents were obtained,
[15] and witnesses interviewed, in Canada. You have also seen
[16] videotaped depositions taken in Canada. I instruct you that
[17] various treaties permit United States law enforcement
[18] official to interview Canadian citizens and obtain documents
[19] from them, as well as to require them to provide deposition
[20] testimony such as the testimony you saw, consistent with
[21] both United States and Canadian law. There is nothing
[22] improper or illegal with the government using these
[23] techniques to obtain evidence.
[24]     A couple of miscellaneous things.
[25]     A person may, legally, authorize another to sign

Page 5737

[1] his or her name to a legal instrument. That authorization
[2] may lapse on the death of the person giving the
[3] authorization.
[4]     The IRS has available to it a civil procedure by
[5] which it may summon a person to appear for questioning about
[6] his or her tax affairs, if the IRS has not been able
[7] otherwise to obtain relevant information, or summon for
[8] questioning other persons with knowledge. Persons summoned
[9] would have a right to decline to answer the IRS' questions.
[10] If a taxpayer is represented by a lawyer or accountant in
[11] his dealings with the IRS, the IRS may deal directly with
[12] the representative. The IRS also has available to it civil
[13] procedures by which it can assert liens against the assets
[14] of a person who owes taxes or obtain a legal determination
[15] as to whether certain assets are those of the person who
[16] owes taxes.
[17]     Under Delaware law, if a corporation fails to pay
[18] the franchise taxes it is required to pay, the corporation
[19] is dissolved, that is, its corporate charter granted by
[20] Delaware is inoperative. If the corporation subsequently
[21] pays all unpaid franchise taxes, the corporation's charter
[22] becomes operative, retroactively to the date of dissolution,
[23] and corporate action taken during the intervening period is
[24] retroactively validated. Delaware law makes it a
[25] misdemeanor to exercise corporate powers while a corporate

Page 5738

[1] charter is inactive, but only the State of Delaware can
[2] bring criminal proceeding for that reason. In the absence
[3] of fraud or bad faith, the corporate officer may enter into
[4] transactions binding the corporation to corporate creditors
[5] remedies against the corporation, even when the corporate
[6] charter is inoperative. There is no evidence that the State
[7] of Delaware ever charged any corporation with which
[8] Mr. Trupin had a connection, or any shareholder, director or
[9] officer thereof, with criminal conduct for exercising
[10] corporate powers while the corporation's charter was
[11] inoperative.
[12]     Some of the exhibits you saw were charts. These
[13] charts were introduced basically as summaries. At this
[14] point I'm talking. You will recall sort of charts that are
[15] up against the wall, they had Mr. Feinerman testify about.
[16] They are not direct evidence really. They are summaries of
[17] evidence. They are resumes or visual representations of
[18] information or data as set forth either in testimony or in
[19] documents. They are admitted as aids to you. They are not
[20] in and of themselves evidence. They are intended to be of
[21] assistance to you in your deliberations.
[22]     In understanding the evidence which you have
[23] heard, it is clearly easier and convenient to utilize
[24] summary charts than to place all of the relevant documents
[25] in front of you. It is up to you to decide whether those

Page 5739

[1] charts fairly and correctly present the information in the
[2] testimony and the documents. The charts are not to be
[3] considered by you as direct proof of anything. They are
[4] merely graphic demonstrations of what the underlying
[5] testimony and documents are.
[6] So, it is up to you to determine whether these
[7] charts should be accepted or rejected on the basis of the
[8] underlying evidence and whether they have any value or
[9] significance whatsoever.
[10] To the extent that the charts conform with what
[11] you determine the underlying evidence to be, you may accept
[12] them. But one way or the other, you should realize that
[13] charts are not in and of themselves direct evidence. They
[14] are merely visual aids.
[15] Some charts, not admitted into evidence — I am
[16] talking now about charts that Ms. Neils used in her closing
[17] argument — although they may have referred to, or included
[18] all or portions of, documents admitted into evidence, were
[19] used during closing argument. Such a chart is not evidence
[20] but was used to illustrate or clarify the argument of
[21] counsel, and such charts may be considered by you, not as
[22] evidence, but for that purpose.
[23] Now, one other thing. One or more of you may
[24] have made notes for your personal use during the course of
[25] this trial. If any person has made notes, that person may

Page 5740

[1] use those notes to refresh his or her recollection of the
[2] evidence. Other jurors should not rely on a person who made
[3] notes; that is, it is up to each juror to recall the
[4] evidence for herself or his self. But the person who made
[5] the notes may use them for his own personal purposes, but
[6] ultimately all of you have to rely on your own recollection
[7] and not just defer to somebody who happened to make notes.
[8] Now, in a couple of minutes you are going to go
[9] into the jury room and start deliberating on this case.
[10] Under your oath as jurors, you are not to be swayed by
[11] sympathy. You are to be guided solely by the evidence in
[12] this case and under the crucial hardcore question that you
[13] must ask yourselves as you sift through the evidence is, has
[14] the government proven the guilt of Mr. Trupin beyond a
[15] reasonable doubt?
[16] It is for you alone to decide whether the
[17] government has proven that Mr. Trupin is guilty of the
[18] crimes charged, solely on the basis of the evidence, and
[19] subject to the law as I have explained it. It must be clear
[20] to you that once you let prejudice or bias or sympathy
[21] interfere with your thinking, there is a risk that you will
[22] not arrived at a truly just verdict. You must also put
[23] anything out of your mind you may have heard about
[24] Mr. Trupin outside of this courtroom.
[25] If you have a reasonable doubt as to the guilt of

Page 5741

[1] Mr. Trupin, you must not hesitate for any reason to find the
[2] verdict of not guilty.
[3] But on the other hand, if you should find that
[4] the government has met its burden of proving guilt beyond a
[5] reasonable doubt, you must render a verdict of guilty.
[6] Now, when you deliberate on the verdict, to
[7] record a verdict, it must be unanimous. I you do want to
[8] repeat, though, that each juror is entitled to his or her
[9] own opinion. You should, however, exchange views with your
[10] fellow jurors. That's the very purpose of jury
[11] deliberations, to discuss and consider the evidence and
[12] listen to the arguments of fellow jurors, to present your
[13] individual views, to consult with one another, and to reach
[14] an agreement based solely and totally on the evidence, if
[15] you can do so without violence to your own individual
[16] judgment.
[17] So, each of you must decide the case for
[18] yourself, after consideration with your fellow jurors of the
[19] evidence in the case, but you should not hesitate to change
[20] an opinion, which after discussion with your fellow jurors
[21] appears erroneous.
[22] However, if after carefully considering all the
[23] evidence and the arguments of your fellow jurors, you
[24] maintain a conscientious view that differs from the others,
[25] you are not to yield your views simply because you are

Page 5742

[1] outnumbered. Your final vote must reflect your
[2] conscientious view without of how the issue should be
[3] decided.
[4] So, now that I have charged you as to what the
[5] law is, you are about to go into the jury room to begin your
[6] deliberations. If during your deliberations you want to see
[7] any exhibits, they will be sent in to the jury room on
[8] request.
[9] If you want any of the testimony read, try to be
[10] as specific as you possibly can. If there are portions of
[11] testimony, or exhibits, that you want, and if we don't
[12] respond immediately, be patient. We are looking for exactly
[13] what you have asked for.
[14] Similarly, should you want to see any of the
[15] videotaped depositions, or any portions thereof, again, that
[16] will be arranged.
[17] Your request for exhibits or testimony, in fact
[18] any communication with the court from here on in, should be
[19] made to me in writing — there will be a pad in there for
[20] you to use — signed by the foreperson — and the foreperson
[21] is automatically Juror No. 1, Mr. Coleman — and given to
[22] one of the Marshals, who will be outside the door of the
[23] jury room. You will meet the Marshal in a few minutes, but
[24] from here on in, now that you are deliberating, all
[25] communications are to be through the Marshal and not with

Page 5743

[1] Mina.
[2]     If we get any questions, we will respond. Any
[3] questions or requests, we will respond as promptly as
[4] possible in writing or, more likely, by having you come back
[5] to the courtroom so that I can speak to you in person.
[6]     In any event, do not tell me or anybody else how
[7] the jury stands on the issue of the defendant's guilt until
[8] after a unanimous verdict has been reached.
[9]     As I just mentioned, Juror No. 1 is the
[10] foreperson responsible for signing all communications with
[11] the court and handing them to the Marshal during
[12] deliberations. The fact that a juror is the foreperson
[13] imposes that duty of passing notes to me. However, the jury
[14] should understand that the vote of the foreperson has equal
[15] weight with that of every other person on the jury, no
[16] greater or no less.
[17]     Finally, each of you must be in agreement with
[18] the verdict that is announced in court. Once the verdict is
[19] announced by the foreperson in open court, and officially
[20] recorded, it cannot ordinarily be revoked.
[21]     Also, and I will explain it to you in a couple
[22] minutes, we will give you a verdict sheet which is simply a
[23] piece of paper on which you can indicate what the jury's
[24] verdict is.
[25]     In this case there are two counts. We'll say

Page 5744

[1] Count One will give the statutory reference, you will say
[2] guilty or not guilty; or Count Two, not guilty or guilty.
[3] It has to be signed by the foreperson. Of course, it is
[4] only to reflect the unanimous vote of all the jurors.
[5]     Now what I am going to do, I'm going to ask you
[6] to stay in court for a few minutes there. A couple of your
[7] individual problems I want to get my recollection refreshed
[8] on and that would be very brief and we will do that outside
[9] of your presence. I also want to get the opportunity to ask
[10] the lawyers whether I have said anything I didn't tell them
[11] I was going to say, or whether I forgot to say something I
[12] did tell them I was going to say. I'll do that out of your
[13] presence.
[14]     (Continued on next page)

Page 5745

[1]     (At the sidebar)
[2]     THE COURT: The question at this point is did I
[3] read the script?
[4]     MR. PUCCIO: Yes.
[5]     MS. NEILS: Yes.
[6]     MR. RITCHIN: Yes.
[7]     THE COURT: All objections on either side?
[8]     MR. RITCHIN: Yes.
[9]     THE COURT: Did defense counsel get a chance to
[10] look at the verdict sheet?
[11]     MR. PUCCIO: I did, yes.
[12]     THE COURT: Is it okay?
[13]     MR. PUCCIO: Subject to my all my objections, it
[14] is.
[15]     THE COURT: I'm talking about the form of the
[16] verdict sheet. Anything wrong?
[17]     MR. PUCCIO: Yes, I mean I made, I asked for a
[18] lesser included offense charge.
[19]     THE COURT: Yes, that objection is preserved. It
[20] doesn't include that, and obviously you have a Rule 29
[21] objection, and I shouldn't be giving them that verdict
[22] charge at all. Those are preserved.
[23]     Now let's go inside. I think it is better if I
[24] leave them in here. There is a marshal in here, and just
[25] tell him to keep an eye on the jury. They may want to start

Page 5746

[1] deliberating no matter what I tell them if I send them
[2] inside.
[3]     (Continued on next page)
[4]     (Pages 5747 - 5772 sealed)